# Exhibit 1
# Weingrad Deposition Transcript

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:25-cv-00396-SI |
| DABELLA EXTERIORS LLC, | ) | |
| Defendant. | ) | |

DEPOSITION OF LEON WEINGRAD

October 5, 2026

Monday

10:00 A.M.

THE DEPOSITION OF LEON WEINGRAD was taken from Portland, Oregon, before Sara Fahey Wilson, CCR, CSR, Certified Shorthand Reporter in and for the State of Oregon and Washington, via remote videoconferencing.

at that point. My wife and child were not at the residence at that time.

**Q. Other than you asking them who they were and them identifying themselves as Dabella, was anything else communicated between you and Dabella at that point?**

A. Hmm. They were -- they asked me if I wanted -- if I would be interested -- which is odd. They asked me if I was interested in getting any work done on my house. And I just was like -- I couldn't believe that they were actually standing in front of me. But that's what I remember -- something along those lines.

My attorney just happened to be in town working on something -- because he works on -- he does cases in Oregon -- and I called him right away, and he was nearby, so he was able to get over there to get to the house within minutes, so he took it from there.

**Q. Okay.**

**Did you have any other communications with Dabella after, I guess, you closed the door on them?**

A. I had no -- as far as I know, I don't think so.

**Q. Did Dabella say anything harassing to you?**

A. No. I was more on the defensive side because once they said they were Dabella I couldn't believe -- considering we were suing them, I couldn't believe they're actually at my door, which kind of felt -- it felt harassing to me because I didn't know what their intentions were with two men standing out on my doorstep, you know. Yeah.

**Q. Can you describe what they looked like at all?**

A. They looked like two pretty well-built, younger men. Maybe in their mid twenties. Upper twenties.

**Q. Do you remember what they were wearing at all?**

A. No. I don't -- I think -- I think -- I think they had -- I think they had Dabella outfits on. Their shirts said it on it.

**Q. Okay.**

**So that's how you knew they were from Dabella?**

A. Well, they also said it.

**Q. Okay.**

**Did you tell them anything about the lawsuit?**

A. No.

Q. Did anybody from Dabella threaten any violence?
A. No. Not to me, no.
Q. Okay.
So let's see here. When you called Mr. Perrong, he arrived on the site. Is that correct?
A. I'm guessing that's what happened.
Q. Okay.
And did Dabella leave the property? Had they already left the property after you had -- you had closed the door on them?
A. Yes.
Q. Okay.
And did you witness Mr. Perrong approach Dabella at all?
A. I didn't see that.
Q. Okay.
So you call Mr. Perrong. Does he come to the door? Does he talk to you? Or does he talk with Dabella?
A. I don't recall what happened after that.
Q. Okay.
Did you witness -- so you didn't witness Mr. Perrong approach any of the Dabella folks. Is

that correct?
A. I didn't see it with my own eyes, no.
Q. Do you have a Ring camera or any other camera on your house?
A. I do.
Q. What kind of camera?
A. I think it's a Ring, like you mentioned.
Q. Okay.
And would your Ring have recorded the interaction with Dabella?
A. Unfortunately, no. It was broken. It's broken. It never worked.
Q. Did you take any photos of Dabella?
A. No.
Q. Are you aware of anybody who took any photos of Dabella?
MR. PERRONG: Objection to form. Objection to attorney-client privilege.
Instructing the witness not to answer.
BY MS. ZELMER:
Q. Did you call the police?
A. No.
Q. Do you know who did call the police?
MR. PERRONG: Objection to form. Objection to attorney-client privilege.

Instructing the witness not to answer.

MS. ZELMER: Well, how is it attorney-client privilege if it's just a fact of whether or not someone called the police?

MR. PERRONG: To the extent that you can answer without revealing a privileged conversation, you can answer.

THE WITNESS: It's going to be difficult to do because that was discussed between me and my attorney.

BY MS. ZELMER:

**Q. Okay.**

**And I'm just going to probably ask you a lot of questions that are going to, you know, draw objections, but I just want it on the record then.**

**So Mr. Perrong, did he ever enter your house at all? And if so, for how long?**

MR. PERRONG: Objection to form.

THE WITNESS: No, Mr. Perrong never entered my residence.

BY MS. ZELMER:

**Q. Did you discuss with Mr. Perrong any interactions with Dabella or interactions with the police at all?**

MR. PERRONG: Objection to form. And

objection to attorney-client privilege.
Instructing the witness not to answer.
BY MS. ZELMER:
**Q. Okay.**
**So you didn't take videos or a photo of the event, and you're not aware of anybody else except for possibly your attorney who took videos or photos of this October 20th visit. Is that correct?**
THE WITNESS: All I can say --
MR. PERRONG: Objection to form.
THE WITNESS: All I can say is I did not take any pictures or videos.
BY MS. ZELMER:
**Q. Okay.**
**So you didn't call the police. Is that correct?**
A. No, I did not.
**Q. Do you know who did call the police?**
MR. PERRONG: Objection to form.
You can answer to the extent you know.
THE WITNESS: As far as I know my attorney called the police.
BY MS. ZELMER:
**Q. Okay.**
**And do you know what was communicated to**

the police?
A. I do not.
**Q. Did you direct your attorney to call the police on Dabella?**
A. No.
MR. PERRONG: Objection to form.
And I'm instructing the witness not to answer.
THE WITNESS: Okay.
BY MS. ZELMER:
**Q. Did you -- did you tell your attorney that Dabella was harassing?**
MR. PERRONG: Objection to form.
Instructing the witness not to answer for privilege.
BY MS. ZELMER:
**Q. Did you tell your attorney that -- that Dabella had engaged in violence?**
MR. PERRONG: Objection the form.
Instructing the witness not to answer on the basis of attorney-client privilege.
BY MS. ZELMER:
**Q. Did you discuss anything with the police once they arrived?**
A. I came down to the end of the street

briefly when I saw the police. At that time the police were looking for Dabella. But I never saw them again, and the police really didn't give me too much information.

**Q. Did the police ask you any questions?**

A. No.

**Q. Did you inform the police that Dabella was harassing you?**

A. No.

**Q. Did you inform the police that Dabella had engaged in any type of threat or violence?**

MR. PERRONG: Objection to form.

THE WITNESS: No, not that I recollect.

BY MS. ZELMER:

**Q. At the time that the police were called where was Dabella? Had Dabella already left the property?**

MR. PERRONG: Objection to form.

THE WITNESS: Yes, they had already left the property. And when I came out there the police were searching for them. They did locate them, but I was kind of left out of it. It was between my attorney and the police, and that's kind of where I left it.

BY MS. ZELMER:

Q. Did -- okay. So you came out there. Was Mr. Perrong engaging in communications with the police?

A. Yes.

Q. Okay.

And did you witness those communications?

A. I wasn't -- I kind of walked off a little bit. I wasn't, like, listening to what they were doing. I just got curious for a second to see if they found them. That's all I really was concerned about. I let my attorney handle the rest.

Q. Did you -- did the police cite them at all, to your knowledge? Ticket them? Give them a warning? Anything?

A. I don't recall.

Q. Did you sign any kind of documents with the police?

A. No. No. I just think that -- what -- I just heard the police say trespassing. That was the only thing I heard. Like, no, that was it. It was kind of broken up. I wasn't able to hear a lot of it, but I did hear they were trespassing.

Q. So you didn't personally witness Perrong calling the police. Is that correct?

A. I didn't witness that part, no.

Q. And do you know anybody who did witness that?

A. No.

Q. Did you -- and you didn't personally witness Perrong approaching Dabella at all?

A. No.

Q. Did you witness Mr. Perrong taking any video or photos?

A. No.

Q. Where was Dabella when the police showed up?

A. That I'm not sure of.

Q. Did you witness Dabella threatening to punch Mr. Perrong in the face?

A. No.

Q. Did you witness Dabella saying that he was going to make them square and it wasn't going to end well?

A. No.

Q. Did Mr. Perrong show up as your attorney?

A. Yeah. Yeah, it's a legal issue. That's why I stepped away and let him handle it.

Q. Okay.

As part of our second request for

STATE OF OREGON )
) ss.
County of Lane )

I, Sara Fahey Wilson, CSR-CCR, Certified Shorthand Reporter for the State of Oregon and Washington, certify that the witness was sworn and the transcript is a true record of the testimony given by the witness; that at said time and place I reported all testimony and other oral proceedings in the foregoing matter; that the foregoing transcript consisting of 49 pages contains a full, true, and correct transcript of the proceedings reported by me to the best of my ability on said date.

If any of the parties or the witness requested review of the transcript at the time of the proceedings, correction pages have been inserted.

IN WITNESS WHEREOF, I have set my hand and CSR seal this 14th day of October 2026 in the City of Eugene, County of Lane, State of Oregon.

_signature_
Sara Fahey Wilson, CSR, CCR
Oregon CSR No. 06-0400, Expires March 31, 2029
Washington CCR No. 21014643, Expires May 7, 2027